IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

|  |  |  |
|---|---|---|
|  | * |  |
| UNITED STATES OF AMERICA, | * |  |
| Plaintiff, | * |  |
|  | * | CR. NO. 04-20299-D |
| vs. | * |  |
| DONNIE JOHNSON, | * |  |
| Defendant. | * |  |

## ORDER ON MOTION TO SUPPRESS (DOCUMENT NO. 35)

Before the Court is Defendant's motion to suppress evidence obtained as a result of a search of a property in which Defendant had a possessory interest. The Court conducted an evidentiary hearing on March 31, 2005, and took the matter under advisement. For the reasons set forth herein, Defendant's motion is granted.

## FACTS

On February 28, 2004, officers observed Defendant walking along a path through a field in the downtown area. Defendant was known to officers and based on informants' tips was believed to have sold crack cocaine from a rooming house at 354/356 Able Street in Memphis. Officers testified that they saw Defendant park his car some distance away and begin walking in the direction of the rooming house. According to officers, their suspicion was aroused when Defendant did not

This document entered on the docket sheet in compliance with Rule 55 and/or 32(b) FRCrP on 5-23-05

1



park his vehicle in front of the rooming house, as if he did not want anyone to know that he was there.

When officers saw Defendant approaching their vicinity, they called out to Defendant by name. Officers placed Defendant against a fence, patted him down, and removed the contents of his pockets and either placed or threw them on the ground. Next, officers asked where Defendant was heading. Defendant responded that he was going to his uncle's room at the rooming house on Able Street. Officers then asked Defendant if he had any weapons or arms, including hand grenades or rocket launchers. When Defendant answered that he did not, officers asked Defendant, "do you mind if we go with you," whereupon, officers accompanied Defendant to the rooming house. According to Officer James Goines ("Goines"), Defendant stated, "I just want to let you know before you go in that I have two guns in the room." Defendant denies ever making such a statement to officers. Two shotguns were found in the room, one of which was reported stolen.

Officer Goines testified that Defendant executed a written consent to search. However, the Court finds that a genuine question of fact was created from the proof about the timing of the consent. From the proof, it appears more likely than not that the consent was signed after the search was conducted and the weapons seized.

## ANALYSIS

### I.  Standing or "Legitimate expectation of Privacy"

Rule 41(e) of the Federal Rules of Criminal Procedure provides that a person alleging an unlawful search and seizure may move for the suppression of evidence on the ground, among others, that the property was illegally seized without warrant and in violation of defendant's Fourth Amendment right. The initial question is whether a search or seizure (i.e., a violation of a legitimate expectation of privacy) occurred with respect to the defendant for purposes of establishing standing

2

to dispute an infringement of a personal interest the Fourth Amendment is designed to protect. *See Rakas v. Illinois*, 439 U.S. 128, 140 (1978). The United States argues that Defendant does not have standing because he did not have an ownership interest in his uncle's rooming house apartment, thus, no expectation of privacy existed in the room where the shotguns were seized. The Court rejects this argument. The Court finds that the better analysis begins at the initial search and seizure contact with Defendant and not at the point where subsequent derivative fruits, e.g., access to room and discovery of two shotguns, were obtained.

Courts have adopted *Katz's* two-prong inquiry in determining whether a defendant has a legitimate expectation of privacy, namely, (1) whether defendant had an actual, subjective expectation of privacy; and (2) whether society is ready to find that expectation reasonable. *Katz v. United States*, 389 U.S. 347, 353 (1967). We find that both prongs were met and that nothing suggests that Defendant waived his privacy rights upon initial contact with the officers.

Officer Goines initial stop of Defendant was based on 1) Defendant's general reputation as a drug dealer; 2) being discovered in a high crime area; 3) and failing to park his car in front of what officers viewed as his home. Officers then observed Defendant walking toward the room on Able. There is nothing about Defendant's actions or conduct at this point that establishes a reasonable particularized suspicion that Defendant was engaged in criminal activity or posed a threat to officers. The officers did not describe any furtive moves by Defendant nor any objects that looked like a weapon, nor did Defendant flee. The fact of Defendant's alleged drug dealing status, standing alone, does not provide reasonable suspicion to stop and search Defendant. It is reasonable for a person to expect that engaging in the type of inchoate acts the police observed, without more, would be free from an officer's scrutiny or interference. Seizing Defendant without articulable facts that the suspected individual was engaged or about to engage in illegal activity constituted a violation of

Defendant's legitimate expectation of privacy. Assuming arguendo that the officers had reasonable suspicion for a temporary stop and frisk, Defendant still retained a legitimate expectation of privacy in the contents of the interior pockets of his clothing subsequently searched by the officer.

Next, Plaintiff argues that because Defendant doesn't have an ownership interest in his uncle's apartment he can not contest the admissibility of the evidence because there is no expectation of privacy in his uncle's apartment. Plaintiff cites *Rakas v. Illinois* for this purpose. *Rakas v. Illinois* can be distinguished, however, from the case at bar because the defendant in *Rakas* was a mere passenger in a car he did not own when officers legally stopped and searched it and found an illegally possessed sawed-off rifle. *Rakas v. Illinois*, 439 U.S. 128, 129 (1978). The defendant in *Rakas* had neither ownership nor a possessory interest in the vehicle in which he was a passenger. The *Rakas* majority noted in its analysis that "[n]one of the passengers is said to have had control of the vehicle or the keys" in determining that the three passengers did not have an expectation of privacy in the vehicle. *Id.* at 155. In this case, the Defendant had a possessory interest in his uncle's rooming house residence in that his uncle had given him permission to occupy the room for the evening. Further, Defendant possessed the keys to the locked room. (Plaintiff's Resp. to Motion to Suppress at p. 7). Defendant had both access and the right to exclude parties from the premise sufficient to demonstrate a legitimate expectation of privacy in the area. *United States v. Salvucci*, 448 U.S. 83, 84 (1980) (it must be asked not merely whether the defendant has a possessory interest in the items seized but also whether he had an expectation of privacy in the area searched).

For these reasons, the Court finds Defendant's legitimate expectation of privacy was infringed. Thus, Defendant has standing to contest admission of the evidence in this matter.

## II. Search and Seizure

The basic purpose of Fourth Amendment prohibition against unreasonable searches and seizures is to safeguard privacy and security of individuals against arbitrary invasions by governmental officials. *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523 (1967). The Fourth Amendment protects "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...," U.S. Const. amend. IV, and "[t]he question of whether an officer has reasonable grounds to 'stop' and 'frisk' falls directly within the Fourth Amendment's proscription against unreasonable searches and seizures." *United States v. Walker*, 924 F.2d 1, 3 (1st Cir.1991) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). A warrantless search is *per se* unreasonable except for a few well-defined exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967); *United States v. Lewis*, 504 F.2d 92, 100 (6th Cir. 1974). Among these exceptions are the so-called *Terry* "stop and frisk" searches in connection with an investigative stop. *Terry v. Ohio*, 392 U.S. 1 (1968). In *Terry v. Ohio*, the United States Supreme Court held that:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Terry*, 392 U.S. at 30-31. Additionally, where a Fourth Amendment violation has been asserted, the plaintiff has the burden of proving that the conditions of a temporary *Terry* investigative stop has been meet by a preponderance of the evidence. *See United States v. Winfrey*, 915 F.2d 212,

216 (6th Cir. 1990) (*citing Florida v. Royer*, 460 U.S. 491, 500 (1983) to place the burden of proof upon the plaintiff).

The initial inquiry is whether officers "have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981); *United States v. Sokolow*, 490 U.S. 1, 7 (1989). The requirement of particularized suspicion encompasses two elements. *See Cortez*, 449 U.S. at 418. First, the assessment must be based upon the totality of the circumstances. *Id.; see also United States v. Gilliard*, 847 F.2d 21, 24 (1st Cir. 1988) (recognizing "that roadside encounters between police and suspects are especially hazardous."); *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). Second, that assessment must "arouse a reasonable suspicion that the particular person being stopped has committed or is about to commit a crime." *See United States v. Montero-Camargo*, 208 F.3d 1122, 1129-30 (*quoting Cortez*, 449 U.S. at 418 and *Terry*, 392 U.S. at 21, n.18). "The officer must be able to articulate more than an 'inchoate and unparticularized suspicion' or a 'hunch' that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (*quoting Terry*, 392 U.S. at 27, n.2) ("[t]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence"). Though law enforcement officers are not asked to ignore the relevant characteristics of a neighborhood, an individual's presence in an area of expected criminal activity, standing alone, is not enough to support reasonable, particularized suspicion that a person is committing a crime. *Id.* at 124. Where police rely on information obtained from citizen tips, "an informant's veracity, reliability and basis of knowledge" are relevant in determining whether the reasonable suspicion standard has been satisfied. *Alabama v. White*, 496 U.S. 325, 328 (1990). Suitably corroborated, informant tips exhibits sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop. *Florida v. J.L.*, 529 U.S. 266, 270 (2000). Before police

6

officer places a hand on the person of a citizen in search of anything, the officer must have constitutionally adequate reasonable grounds for doing so, *Sibron v. New York*, 392 U.S. 40, 63 (1968), and a *Terry* search consists solely of patting of the outer clothes for instruments of assault. *Id.* at 65. Lastly, the test for determining if an individual has been seized in Fourth Amendment terms is whether a reasonable person would feel free to leave under the totality of the circumstances. *Florida v. Bostick*, 501 U.S. 429, 436 (1991).

Notably, in *Sibron*, the companion case to *Terry*, the defendant was observed by an officer talking to known drug addicts. Officer had defendant leave a diner after having placed an order and told defendant "you know what I am after" and then reached into defendant's pocket to remove drugs. *Sibron*, 392 U.S. at 45. The Court reversed the defendant's conviction because this was not an appropriate *Terry* frisk and there were no grounds for an investigative stop. In *Florida v. J.L.*, officers received an anonymous call reporting that a young African-American male wearing a plaid shirt was standing at a bus stop carrying a gun. *Florida v. J.L.*, 529 U.S. at 268. Officers saw him but saw no gun or unusual movement. *Id.* With no reason to suspect defendant other than the anonymous tips, an officer *Terry* frisked him and found a weapon. *Id.* The Court affirmed the judgment of the Florida Supreme Court's holding that the frisk of defendant was unreasonable. *Id.* at 269.

In the case at bar, officers assert that their inquiry was based on information from informants that Defendant was selling illegal drugs coupled with their prior experience with Defendant. Such a basis for a search can at best be termed generalized. If officers are relying upon particular information about particular illegal activity obtained from tips, it is part of their burden of proof to articulate this along with the veracity, reliability and basis of their informant's knowledge. Like the officers in *Florida v. J.L.*, officers' actions in the case at bar were unreasonable. They conducted a

7

search that went beyond a *Terry* frisk relying on unsubstantiated tips with no articulable facts that Defendant had a weapon or otherwise posed a danger to officers' safety. Officers assert that they observed Defendant "loitering and acting in a suspicious manner" in a known area for narcotics trafficking. Defendant asserts, however, that he was walking through a path when officers threw him against a fence and searched him with their weapons drawn. What we do know for certain is that officers found nothing from their frisk and search of Defendant's interior pockets. The activities of Defendant on the day in question and the generalized information about Defendant's reputation as a drug dealer were insufficient to establish reasonable suspicion for the frisk and subsequent search. However, since the officers frisk and clothing search yielded nothing, they were obligated to allow Defendant to continue his journey unimpeded.

Assuming arguendo that the officers had reasonable suspicion for a temporary stop and frisk, a constitutionally valid "frisk" occurs when a police officer conducts a cursory search. This should be "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry v. Ohio*, 392 U.S. 1, 29 (1968) (permitting an investigative stop and a frisk for weapons); *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (stating that frisks may be used only to find weapons, not to gather evidence). The police found no incriminating evidence from the frisk. There was no articulable suspicion of any other illegal activity, thus, there was no basis for detaining Defendant or for conducting a residential search.

Likewise, assuming arguendo that there was a concern about officer safety, once Defendant was patted down and no weapons or contraband found Defendant should have been permitted to proceed on his way. Instead, Defendant alleges that officers took a set of keys and money from his pocket and threw the contents on the ground. Like the officer in *Sibron* who reached in defendant's

pocket in search of drugs, the officers in the case at bar went beyond the scope of a *Terry* pat and frisk when they entered Defendant's pockets. This constituted a search beyond the parameters of *Terry* and in violation of Defendant's legitimate expectation of privacy under a *Katz* analysis.

For the above reasons, this Court holds that the officers' actions amounted to the sort of evidentiary search that *Terry* expressly refused to authorize. *See Terry*, 392 U.S. at 26, and that the Supreme Court has condemned in subsequent cases. *See Michigan v. Long*, 463 U.S., at 1049, n. 14 (1983); *Sibron,* 392 U.S. at 65-66 (1968).

### III. The "Purged Taint" Doctrine

The question presented is whether the connection between the police officer's unconstitutional search and Defendant's subsequent confession and consent search were "so attenuated as to dissipate the [primary] taint." *See Nardone v United States*, 308 U.S. 338, 341 (1939). In resolving questions of attenuation, courts typically scrutinize the facts of the individual case, with particular attention to such matters as the "temporal proximity" of the official illegality and the discovery of the evidence, "the presence of intervening circumstances," and "the purpose and flagrancy of the official misconduct." *Brown v. Illinois*, 422 U.S. 590, 603-604 (1975). Unless an exception is sufficiently established, society's interest in excluding "fruits of the poisonous tree" evidence despite their probative value shall be upheld. *See Id.* at 599-60; *Wong Sun v. United States*, 371 U.S. 471, 486 (1963). One exception to the requirements of both a warrant and probable cause (and presumptively, reasonable suspicion) is a search that is conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 418, 149 (1973); *United States v. Drayton*, 536 U.S. 194, 207 (2002) (for the proposition that consent may be relied upon in place of reasonable suspicion).

The idea behind the purged taint doctrine is that if enough additional factors intervene between the original illegality and the final discovery of the evidence, the link between the two is

9

so tenuous that the exclusionary rule should not be applied. In *Wong Sun v. United States*, the defendant was arrested without probable cause, arraigned, and released on his own recognizance. *Wong Sun*, 371 U.S. at 475. Several days later, the defendant voluntarily traveled to the police station where he received *Miranda* warnings and made an incriminating statement. *Id.* at 476. The Court held that the statement could be introduced against defendant, despite the statement's derivation from an original illegal seizure, because several days had passed between the initial illegality and the statement. Additionally, the Court found that the voluntariness of his returning to the police station to make the statement made the connection between the taint and the verbal evidence too attenuated. In the case at bar, in the time between the illegal seizure and the "consent", Defendant is alleged to have volunteered to have allowed officers to search the uncle's room within minutes of the officer's illegal act in searching for incriminating evidence outside the scope of the constitutional *Terry* frisk. Plaintiff asserts that the officers engaged in "small talk approximately 4 to 5 minutes" after the frisk and search. This consensual conversation, subsequent to an illegal seizure, does not constitute consent to a subsequent search.

Officers assert that soon after this Defendant consented to their accompanying him to the rooming house to conduct a search and told them where guns were located before unlocking the door to enter the apartment. Officers presented Defendant with a consent to search form. There is an issue of whether the appropriate room number was noted on the consent form, and when the consent form was actually executed. The testimony was that officers had to go back downstairs to get a clipboard on which to have Defendant sign the consent form. In the narrative on direct examination there was no testimony about Defendant executing the consent form prior to the trio proceeding up to the rooming house. The Court finds that the testimony of the officers is not credible on this point and that the written consent was executed after the search and seizure of the weapons. Further, the Court

10

finds that, after the *Terry* frisk and the clothing search, Defendant was seized and not free to leave. Notwithstanding, Defendant was not advised of his right not to consent or object to the search. Thus, the consent was invalid.

Assuming arguendo that the officers obtained a valid verbal consent, the question is whether the alleged statement constituting consent purged the taint of an illegal detention as argued in the alternative by the United States. The Court finds that any alleged verbal consent made after an illegal search and seizure was not sufficiently attenuated in view of the temporal proximity between the initial illegal search and seizure, the domineering police actions and presence, and the absence of any intervening circumstances. *See United States v. Torres*, 274 F.Supp. 2d 146, 157 (2003). The initial taint was not purged.

Defendant asserts that an officer later advised him of his *Miranda* rights. Subsequent *Miranda* warnings, *per se*, cannot always make an act of confession sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between an illegal search and seizure and subsequent inculpatory statements resulting in the discovery of evidence. *See Brown*, 422 U.S. at 601. In order for the causal chain between an illegal search and statements made subsequent thereto to be broken, it is required not merely that statements meet Fifth Amendment standard of voluntariness but that it be sufficiently an act of free will to purge the primary taint. In light of the over breadth of officer's conduct in the initial investigatory stop, any verbal consent Defendant may have made prior to the subsequently executed written consent is deemed an insufficient voluntary act of free will. The Court holds that the doctrine of attenuation does not apply.

## IV.   Conclusion

For the above reasons, this Court holds that the officers actions in this matter amounted to the sort of evidentiary search that *Terry* expressly refused to authorize and that the taint of the illegal seizure was not purged upon officer's subsequent invalid consent and seizure of weapons found in Defendant's possession. Defendant's motion to suppress evidence obtained as a result of illegal search and seizures is GRANTED.

IT IS SO ORDERED this 20th day of May, 2005

                                                                                    _____
                                                                                    BERNICE BOUIE DONALD
                                                                                    UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 45 in case 2:04-CR-20299 was distributed by fax, mail, or direct printing on May 23, 2005 to the parties listed.

---

Doris A. Randle-Holt
FEDERAL PUBLIC DEFENDER
200 Jefferson Ave.
Ste. 200
Memphis, TN 38103

E. Greg Gilluly
U.S. ATTORNEY'S OFFICE
167 N. Main St.
Ste. 800
Memphis, TN 38103

Honorable Bernice Donald
US DISTRICT COURT